**Diane KEMP, Personal Representative of the Estate of Terrance Clay Kemp, Deceased, and Diane Kemp, Individually, Plaintiffs,**

v.

**PFIZER, INC. and Shiley, Inc., Defendants.**

Civ.A. No. 92–71386.

United States District Court, E.D. Michigan, S.D.

Oct. 22, 1993.

---

David D. Patton, James A. Reynolds, Jr., Bloomfield Hills, MI, for plaintiffs.

Steven Glickstein, David Klingsberg, Robin A. Tauber, Kaye, Scholer, Fierman, Hays & Handler, New York City, Kevin S. Hendrick, Richard C. Sanders, Kay R. Butler, Hill Lewis, Detroit, MI, for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

GADOLA, District Judge.

On February 7, 1992, plaintiff Diane Kemp filed a complaint on behalf of herself and the estate of her husband, Terrance Clay Kemp, against defendants Shiley, Inc. and Pfizer, Inc. in Washtenaw County Circuit Court. Pursuant to 28 U.S.C. § 1446, defendants removed the action to this court. Plaintiff subsequently filed an amended complaint on February 16, 1993.

Before the court are the following four motions presented by defendants: (Motion 1) summary judgment based on preemption of Counts I–IV, VI, VII, IX, X, XI, XIII, XV, XVII, and XVIII; (Motion 2) summary judgment as a matter of law on Counts XII and XIV; (Motion 3) summary judgment on Counts VIII, IX, X, and XVI; and (Motion 4) summary judgment on plaintiff's claim for punitive, exemplary, and hedonic damages.

## I. Background Facts

On June 22, 1982, Terrance Clay Kemp underwent surgery in Ann Arbor, Michigan for the implantation of a prosthetic heart valve known as the Bjork–Shiley Convexo–Concave Valve (the "C/C valve"). Defendant Shiley is the manufacturer of the valve and is a wholly owned subsidiary of defendant Pfizer. On July 29, 1986, Mr. Kemp died of cardiac arrest, allegedly the result of complications caused by a fracture of the C/C valve. At the time of death, an autopsy was not performed and the possible causes of death were listed as myocardial infarction, valve malfunction, or aortic dissection. Plaintiff Diane Kemp is Mr. Kemp's surviving wife and is the duly appointed representative of his estate.

In 1992, the parties engaged in negotiations in an effort to settle plaintiff's claim. During negotiations, defendants refused to admit that the C/C valve was defective and that it fractured. As a result, plaintiff alleges she was forced to exhume her husband's body for an autopsy to determine the cause of death. Mr. Kemp's body was exhumed and an autopsy was performed on August 11, 1992. The autopsy determined that the cause of death was a fracture of the C/C valve.

The C/C valve received pre-market approval by the Food and Drug Administration ("FDA") on April 27, 1979. The valve was approved as a Class III medical device.[1] Before approval, defendant Shiley was required to submit proposed labeling information, extensive safety testing data, and descriptions of manufacturing methods and materials. 21 U.S.C. § 360e(c)(1). Following pre-market approval, Shiley was required to maintain records and make reports to the FDA con-

---

1. This device is covered under 21 C.F.R. § 870.3925. This section reads in relevant part as follows:

   Replacement heart valve.
   (a) *Identification.* A replacement heart valve is a device intended to perform the function of any of the heart's natural valves. This device includes valves constructed of prosthetic materials … or valves constructed of a combination of prosthetic and biologic materials.
   (b) *Classification.* Class III (premarket approval). *Id.*

cerning the valve. *Id.* § 360i(a). Through-out the period when the C/C valve was marketed, the FDA still had the power to withdraw its approval and remove the device from the market. *Id.* § 360e(e)(1)(3). In this case, however, Shiley voluntarily withdrew all of its remaining C/C valves from the market and halted production on November 24, 1986. Defendant Shiley then requested withdrawal of its pre-market approval in early 1990.

Plaintiff's complaint alleges the following eighteen counts: (I) negligence; (II) res ipsa loquitur; (III) failure to warn; (IV) continuing duty to warn; (V) breach of express warranty; (VI) breach of implied warranty of merchantability; (VII) breach of warranty of fitness for a particular purpose; (VIII) consumer product warranties under the Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2301–2312; (IX) strict liability; (X) violation of the Michigan Consumer Protection Act: (XI) negligence per se; (XII) intentional infliction of emotional distress; (XIII) fraud on the FDA and Mr. Kemp; (XIV) fraud on Mrs. Kemp regarding the exhumation of her husband's body; (XV) fraudulent concealment; (XVI) mail fraud;[2] (XVII) exemplary damages; and (XVIII) punitive damages. Defendants argue that plaintiff's state law claims concerning Mr. Kemp are preempted by federal law. In addition, defendants seek partial summary judgment on the claims related to the exhumation, on punitive and exemplary damages, and on the federal warranty claim.

## II. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of

action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984) (citation omitted) (quoting Black's Law Dictionary 881 (6th ed. 1979)). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg,* 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

---

**2.** Plaintiff has since conceded that she does not have a private cause of action under the mail

fraud statute.

(Citations omitted). *See Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd,* 929 F.2d 701 (6th Cir.1991). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block,* 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### III. Motion 1: Federal Preemption of Counts I–IV, VI, IX, X, XI, XIII, XV, XVII, and XVIII

In their first motion for partial summary judgment, defendants claim that Counts I–IV, VI, VII, IX, X, XI, XIII, XV, XVII, and XVIII of plaintiff's complaint are preempted by federal law.

#### A. Applicability to State Claims

█ Article VI of the Constitution declares that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As a result, state or local laws that conflict with federal law and regulations are preempted. *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978).

█ Federal laws can invalidate local laws in several different ways. First, Congress can preempt state law "by so stating in express terms." *Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. 707, 712–13, 105 S.Ct. 2371, 2374, 85 L.Ed.2d 714 (1985). Secondly, where Congress has not spoken expressly, "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Field preemption can also occur where the "federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Hillsborough,* 471 U.S. at 713, 105 S.Ct. at 2374. "Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Id.* A state law conflicts with federal law when compliance with both is a "physical impossibility" or when state law is an "obstacle" to the objectives of Congress. *Id.* State or local laws regulating safety matters are favored unless it was the "clear and manifest purpose of Congress" that federal law would supersede the police powers of the state. *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152.

In their motion, defendants ask the court to grant them summary judgment on plaintiff's state law claims alleged in Counts I–IV, VI, VII, IX, X, XI, XIII, XV, XVII, and XVIII. Defendants contend that all of these claims are preempted by the express provisions of the Medical Device Amendments of 1976 (the "MDA") to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301–394. Defendants rely on the following provision of the MDA:

(a) General rule. Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this Act to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act.

21 U.S.C. § 360k(a).[3] In the regulations enacted pursuant to the MDA, section 360k(a)

---

3. State requirements are exempted from section ·360k(a) as follows:

covers those requirements "established by statute, ordinance, regulation, or court decision."[4] 21 C.F.R. section 808.1(b). Thus, defendants contend that the express language of the MDA and its regulations preempt the state law claims asserted by plaintiff.

The three courts of appeals that have addressed the issue have concluded that the MDA preempts state tort law for Class III medical devices. *Stamps v. Collagen Corp.*, 984 F.2d 1416 (5th Cir.) (claims of defective design, inadequate warnings, and negligent failure to warn were preempted), *cert. denied*, —— U.S. ——, 114 S.Ct. 86, —— L.Ed.2d —— (1993); *King v. Collagen Corp.*, 983 F.2d 1130 (1st Cir.) (claims of strict liability, breach of warranty, negligence, failure to warn, misrepresentation, and misbranding were preempted), *cert. denied*, —— U.S. ——, 114 S.Ct. 84, —— L.Ed.2d —— (1993) (No. 92–1979); *Slater v. Optical Radiation Corp.*, 961 F.2d 1330 (7th Cir.) (MDA preempts state claims), *cert. denied*, —— U.S. ——, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992). In *King*, the court held that the state tort claims against the manufacturer of a cosmetic device are preempted by section 360k, but examined each of plaintiff's claims to ensure that preemption was limited to the language of the MDA. *King*, 983 F.2d at 1134–36. The court in *Stamps* came to the conclusion that section 360k(a) " 'sweeps broadly' and encompasses common law tort actions within its preemptive scope." *Stamps*, 984 F.2d at 1421. Lower courts addressing the issue have reached the same result. *See, e.g.*, *Cameron v. Howmedica, Div. of Pfizer Hosp.*

*Prods. Group, Inc.*, 820 F.Supp. 317, 321 (E.D.Mich.1993) (state design defect claim based on defective artificial hip was preempted); *Covey v. Surgidev Corp.*, 815 F.Supp. 1089, 1094–94 (N.D.Ohio 1993) (design defect, negligence, and inadequate testing claims for intraocular lens were preempted); *see also Desmarais v. Dow Corning Corp.*, 712 F.Supp. 13 (D.Conn.1989) (claims against the manufacturer of defective breast implants would have been preempted had they occurred after the enactment of the MDA).

■ The court finds that section 360k of the MDA preempts state law claims against the manufacturers of Class III medical devices covered by the law. The defendants' C/C valve is covered by the MDA under 21 C.F.R. § 870.3925. At the time that the valve was implanted into Mr. Kemp, defendants had received pre-market approval from the FDA.

■ Given that the MDA preempts state law claims, the issue is whether each of plaintiff's individual state claims are preempted by the regulations. The regulation governing preemption states that any requirement "which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under the act" is preempted. 21 C.F.R. section 808.1(b). The preemptive reach of the provision does not extend beyond its specific language. *Cipollone*, —— U.S. at ——, 112 S.Ct. at 2617, 120 L.Ed.2d at 423; *King*, 983 F.2d at 1133.

The basic claim of plaintiff's action is that the C/C valve was defective, and thereby

---

(b) Exempt requirements. Upon application of a State or a political subdivision thereof, the Secretary may, by regulation promulgated after notice and opportunity for an oral hearing, exempt from subsection (a) ... a requirement of such State or political subdivision applicable to a device intended for human use if—
(1) the requirement is more stringent than a requirement under this Act which would be applicable to the device if an exemption were not in effect under this subsection....
*Id.* § 360k(b).

4. Even without this clear statement in the regulations, it is well settled that the state "requirements" mentioned in section 360k(a) include the common law. In *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407

(1992), the Supreme Court stated that " '[state] regulation can be as effectively exerted through an award of damages as through some form of preventative relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.' " *Id.* —— U.S. at ——, 112 S.Ct. at 2620, at 426 (quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 781, 3 L.Ed.2d 775 (1959)). In *Cipollone*, the Court construed statutory language preempting state "requirements." The Court said that the term requirements "sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules." *Id.*

caused Mr. Kemp's death. Because the safety and effectiveness of the valve is governed by the MDA and its regulations, the court will find that those counts in plaintiff's complaint that relate to safety and effectiveness are preempted. As the *King* court noted, "[t]he entire MDA scheme for such Class III devices ... is aimed at determining and regulating the intended purpose of the device, and at ensuring a reasonable level of safety for its users." *Id.* at 1135. Thus, plaintiff's claims based on negligence, res ipsa loquitur, failure to warn, a continuing duty to warn, strict liability, and negligence per se expressed in Counts I–IV, IX, and XI are preempted by section 360k(a). Counts XVII and XVIII for exemplary and punitive damages are also preempted to the extent that they arise from the state law claims that the court will find are preempted.

■ The court also finds that plaintiff's claims concerning the breach of implied warranty of merchantability, the breach of warranty of fitness for a particular purpose, and violation of the Michigan Consumer Protection Act presented in Counts VI, VII, and X are preempted by the MDA. As the court noted in *King*, "the MDA has imposed ... extensive regulation upon class III device manufacturers. The FDA retains rigid control over the entirety of the labeling and packaging of class III products, largely displacing the ability of manufacturers to make additional claims." *Id.* Similar provisions and requirements apply to the C/C valve. *See* 21 U.S.C. §§ 321(m), 352(f), & 352(r). As a result, plaintiff's implied warranty claims and her claim under the Michigan Consumer Protection Act are preempted.

The court also finds that the claims of fraud and fraudulent concealment in Counts XIII and XIV concern requirements of the MDA and its regulations governing disclosure, testing, and reporting procedures to the FDA in the pre-market approval process and during the monitoring process following the granting of approval. 21 U.S.C. section 360e(c)(1). Because plaintiff claims fraud on the FDA as a bar to preemption, the court will examine this issue more fully below.

In reaching these decisions, the court agrees that "[s]tate tort causes of action—to the extent they relate to safety, effectiveness, or other MDA requirements—constitute requirements 'different from or in addition to' the Class III process; they are therefore, preempted." *Stamps,* 984 F.2d at 1424.

### B. Fraud on the FDA as an Exception to Preemption

■ Plaintiff argues that even if the court finds that the MDA preempts her state claims, preemption should not apply in this case because defendant Shiley committed fraud on the FDA during and after the pre-market approval of the C/C valve. Plaintiff alleges that defendants engaged in a far reaching scheme to deceive and defraud the FDA and the public concerning the safety and effectiveness of the C/C valve. Defendants contend, however, that plaintiff's fraud claims should be preempted. They argue that "fraud on an agency" does not undermine or usurp the preemptive effect of the MDA.

The court finds that in enacting section 360k, Congress determined that the FDA, and not this court, has the task of insuring that Class III medical devices are safe and effective and are in compliance with the requirements of the MDA. Were the court to decide that an allegation of fraud on an agency would save all state tort claims against Class III devices, then the provisions of the MDA and the intent of Congress would be rendered a nullity. Such a decision would circumvent the preemptive effect of section 360k, and Congress's intent to protect manufacturers of highly innovative and risky medical devices would be severely undermined.

The court agrees that "where the FDA was authorized to render the expert decision, ... it, and not some jury or judge, is best suited to determine the factual issues and what their effect would have been on its original conclusions." *King,* 983 F.2d at 1140 (Aldrich, J. and Campbell, J. concurring). Thus, if a jury or a judge mistakenly determined that a defendant had not properly complied with FDA regulations, then a state requirement " 'different from, or in addition to' " the dictates of the MDA would be imposed upon a Class III device. *Id.* at 1140. Accusations of fraud or inadequate testing

would nullify the intent of Congress to protect manufacturers from wide open liability for experimental medical devices that the MDA has helped put on the market. As Judge Posner noted, "if experimental procedures are subject to hindsight evaluation of juries, so that failed experiments threaten to impose enormous liability on the experimenter, there will be fewer experimental treatments, and patients will suffer." *Slater,* 961 F.2d at 1333–34. Additionally, the court notes that neither it nor a jury has the expertise, knowledge, or experience that the FDA has in untangling the bramble of procedures and regulations governing pre-market approval and later reporting requirements.

In a similar situation, the Eleventh Circuit came to the conclusion that claims that a defendant manufacturer provided misinformation to an agency would not block preemption in *Papas v. Upjohn Co.,* 926 F.2d 1019 (11th Cir.1991) ("Papas I"), *vacated and remanded for reconsideration,* —— U.S. ——, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992), *reinstated and aff'd,* 985 F.2d 516 (11th Cir.) ("Papas II"), *cert. denied,* —— U.S. ——, 114 S.Ct. 300, —— L.Ed.2d —— (1993). The court found that tort claims concerning pesticides were preempted by the Federal Insecticide, Fungicide, and Rodentcide Act ("FIFRA"), even though plaintiff alleged that the agency involved had not received adequate information from the manufacturer. The court clearly stated that express preemption of state law claims "leaves states with no authority to police manufacturers' compliance with federal procedures." *Papas II,* 985 F.2d at 519. This reasoning was followed by the concurring opinion in the *King* case. *King,* 983 F.2d at 1140.

Plaintiff relies on *Hurley v. Lederle Lab. Div. of Am. Cyanamid,* 863 F.2d 1173 (5th Cir.1988), for its claim that fraud on an agency can block preemption. In *Hurley,* the court held that factual issues remained concerning whether the FDA had received enough information from the manufacturer concerning warning labels. *Id.* at 1179–80.

The court said that the jury should decide whether the FDA was given the correct data, and if it was not, whether its warnings would have been altered as a result. *Id.* The court finds, however, that the reasoning in *Hurley* is inapplicable to this case. The vaccine at issue in *Hurley* was not a Class III medical device. Furthermore, express preemption did not apply to that plaintiff's state claims as it does in this case. Finally, the court disagrees with the conclusion in *Hurley* that a jury should decide whether a defendant complied with FDA regulations. The reasoning in *King* and *Papas II* is more persuasive. *King,* 983 F.2d at 1140; *Papas II,* 985 F.2d at 519.

The court also concludes that "fraud on an agency" does not bar preemption because manufacturers still have every incentive to comply with the FDA's regulatory scheme, even with preemption. To do otherwise would invite the FDA to withdraw its approval, thus causing a halt to further production. Further, if these defendants have indeed committed fraud on the FDA as alleged by plaintiff, then defendants would be subject to criminal penalties for such acts.

Plaintiff has alleged that defendants engaged in a campaign of disinformation against the public and the FDA. Even if true, plaintiff's state law claims are still preempted. This court will not imply a personal cause of action based on violations of the MDA,[5] nor will it substitute its rather limited judgment in the place of the FDA's expertise, experience, and congressional mandate to ensure that Class III medical devices comply with federal law and regulations. To do otherwise would nullify the very purpose of preemption as mandated by Congress.

### C. Pre–Market Approval and Preemption

■ Plaintiff also argues that even if the court finds that her state claims are preempted by the MDA, preemption should

---

**5.** Such a private claim would be prohibited. *See Pacific Trading Co. v. Wilson & Co.,* 547 F.2d 367, 370 (7th Cir.1976) (FDCA does not provide a private cause of action for damages); *Brinkman v. Shiley, Inc.,* 732 F.Supp. 33, 35 (M.D.Pa.)

(The "FDCA does not create or imply a private right of action for individuals injured as a result of violations of the Act."), *aff'd,* 902 F.2d 1558 (3d Cir.1989).

not apply in this case because defendants have withdrawn the C/C valve from the market.[6] The court does not agree. In 1982, when the C/C valve was implanted in Mr. Kemp, the valve had received pre-market approval by the FDA after going through the extensive procedure governing such approval under the MDA. *See* 21 U.S.C. §§ 360c(a) & 360e. Even when the valve fractured, it was an approved medical device under the MDA. The fact that it was later withdrawn from the market, even if the FDA had mandated the withdrawal, does not change the fact that the MDA preempted state law requirements concerning its safety, effectiveness, and otherwise.

Other courts have come to similar conclusions. In *Cameron v. Howmedica, Division of Pfizer Hospital Products Group, Inc.*, 820 F.Supp. 317, 321 (E.D.Mich.1993), the court found that the MDA preempted plaintiff's state law claims even though the defendant's product had been withdrawn from the market. The prosthetic hip joint involved in that case had sustained a failure rate of twenty-five percent, apparently causing the defendant to remove the device from the market after two years. *Id.* at 320 n. 4.

Thus, even though defendants removed their device from the market and halted all further implantations, the MDA still preempts plaintiff's state law claims. The FDA's extensive regulation and monitoring of Class III medical devices ensures that faulty devices are removed from the market even in the absence of state tort claims. The MDA allows and encourages manufacturers to produce new medical devices without the threat of tort litigation. If the preemption protection afforded by the MDA were removed once a faulty device was pulled from the market, then the fear and hesitancy in developing original and ground-breaking medical devices that Congress meant to alleviate would always remain as a bar to the development of needed devices that are potentially dangerous. If manufacturers knew that their umbrellas would be snatched from

them whenever it began to rain, then they would have no incentive to take the risk and venture outside.

The defendants' removal of the C/C valve is merely an example of the process working. The constant monitoring, testing, and regulation by the FDA caused a device, that was previously thought of as helpful, to be removed from the market once it became clear that defendants' and the FDA's expectations were not met. Federal preemption is an important element in encouraging innovation and experimentation in the medical field. The defendants in this case had such protection. As a result, the court will grant defendants' motion for summary judgment on plaintiff's state law claims as delineated above.

### IV. Motion 2: Exhumation Claims under Counts XII and XIV

In their second motion, defendants seek summary judgment on Counts XII and XIV. Plaintiff bases Counts XII and XIV upon the circumstances surrounding the exhumation and autopsy of her husband's body. She claims that defendants knew that her husband's death was caused by the fracture and failure of the C/C valve implanted in his heart, but refused to admit it, thereby forcing her to exhume and perform an autopsy on the body in order to prove that a fracture of the valve was the cause of death. As a result, plaintiff claims that defendants are liable for fraud and intentional infliction of emotional distress. Defendants contend that plaintiff was not forced to conduct the exhumation and that they had no obligation to concede a disputed fact.

The exhumation and autopsy occurred on August 11, 1992. Plaintiff alleges that defendants knew that the failure of the C/C valve caused the death of Mr. Kemp as early as May 27, 1992. On May 27, 1992, defendants informed the FDA, pursuant to FDA reporting requirements, that a valve fracture may have caused Mr. Kemp's death. Based on defendants' letter to the FDA and the opin-

---

6. Plaintiff also claims that the FDA's pre-market approval was conditional and that defendants did not meet the FDA's conditions. Again, this is a matter that the FDA decided. The FDA had the power, after it granted pre-market approval, to withdraw the approval if it found that its conditions had not been satisfied, if the valve proved too dangerous, or if the defendants failed to meet the necessary reporting requirements. The court will not disturb the FDA's judgments.

ion of defendants' own expert, plaintiff alleges that defendants made fraudulent representations that she relied upon that the cause of her husband's death was in dispute.

Because additional discovery has been ordered concerning the issues related to the exhumation, the court will reserve judgment on defendants' motion. The parties may submit supplemental briefs once discovery is complete.

## V. Motion 3: Magnuson–Moss Warranty Act under Count VIII

In their third motion, defendants seek summary judgment on Count VIII of plaintiff's complaint, where she alleges that defendants violated the Magnuson–Moss Warranty Act, 15 U.S.C. sections 2301–2312 ("the Act"). Plaintiff claims that defendant failed to provide certain warranties as required by the Act. Defendants argue, however, that the Act does not apply in this case because the surgical implantation of a prosthetic heart valve is not a "consumer product" that is covered under the statute.[7]

In order for the Act to apply, there must be a sale of a consumer product. The Act defines a consumer product as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes."[8] *Id.* § 2301(1). The Federal Trade Commission ("FTC") has promulgated guidelines that give examples of products to which the Act applies. Among the examples cited include: "boats, photographic film and chemicals, clothing, appliances, jewelry, furniture, typewriters, motor homes, automobiles, mobile homes, vehicle parts and accessories, stereos, carpeting, small aircraft, toys, and food." Magnuson–Moss Warranty Act: Implementation and Enforcement Policy, 40

Fed.Reg. 25,721, 25,722 (1975). Additionally, the legislative history lists similar examples of consumer products. H.R.Rep. No. 1107, 93d Cong., 2d Sess. 4, *reprinted in* 1974 U.S.C.C.A.N. 7702, 7705–06.[9] In both the legislative history and in the FTC's guidelines, prescription drugs and medical devices are not listed among the examples of consumer products.

In deciding whether a prosthetic heart valve is a consumer product, the court finds it instructional to refer to the Consumer Product Safety Act ("CPSA"), 15 U.S.C. §§ 2051–2084, enacted three years before Magnuson–Moss. In the CPSA's definition of consumer product, Congress declares that a consumer product does not include "any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer." *Id.* § 2052(a)(1)(A). Furthermore, medical "devices" covered by the Federal Food, Drug, and Cosmetic Act are specifically not included in the CPSA's definition of consumer products. *Id.* § 2052(a)(1)(H).

While the CPSA's definition of consumer products does not apply in this case, the court finds it useful in deciding whether surgically implanted heart valves are consumer products. *Cleveland Inst. of Elecs., Inc. v. United States,* 787 F.Supp. 741, 745 (N.D.Ohio 1992) (courts can look to other laws for guidance in construing statutory definitions). The definition of consumer products in the CPSA is especially relevant given the fact that several courts have found that the Magnuson–Moss definition of consumer product is much narrower than the definition put forth by the CPSA. *See State Fair v. U.S. Consumer Prod. Safety Comm'n,* 650 F.2d 1324, 1332 (5th Cir.) (definition of consumer product much narrower under Magnu-

---

7. Because the court finds that the C/C valve is not a consumer product, the court need not address defendants' additional arguments that implantation is not a product at all and that the Act does not cover claims for personal injury arising from a breach of a warranty.

8. The regulations indicate that where the use of a particular product is "not uncommon," then it is probably a consumer product. 16 C.F.R. § 700.-1(a).

9. The report lists the following goods as examples of consumer products: washing machines and dryers, dishwashers, food waste disposers, freezers, ranges, refrigerators, water heaters, bed coverings, blenders, broilers, can openers, coffee makers, corn poppers, floor polishers, frypans, hair dryers, irons, toasters, vacuum cleaners, waffle and sandwich grills, air conditioners, fans, radios, televisions, and tape recorders. H.R.Rep. No. 1107, 93d Cong., 2d Sess. 4, *reprinted in* 1974 U.S.C.C.A.N. 7702, 7705–06.

son–Moss), *cert. granted, vac. as moot,* 454 U.S. 1026, 102 S.Ct. 560, 70 L.Ed.2d 470 (1981); *CAT Aircraft Leasing, Inc. v. Cessna Aircraft Co.,* 1991–1 Trade Cas. (CCH) P69,-299, 1990 WL 171010 (D.Kan.1990) (definition under CPSA is "much broader" than under Magnuson–Moss). Thus, it is instructive that the "much broader" CPSA specifically excludes medical devices, like the C/C valve, from its definition of consumer product.

■ The court concludes, as a matter of law, that the C/C valve is not the type of product normally used for consumer purposes by the general public. Goods that are not customarily available to the ordinary person are not consumer products. The Bjork–Shiley 60 degree Concavo–Convex Aortic Prosthetic Heart Valve is not such a product. Medical devices that are surgically implanted are not consumer products. The ordinary consumer has no access to such devices. Heart valves are not sold to unsuspecting consumers relying on the warranties of unscrupulous retailers. Because the C/C valve is not a consumer product, the court will enter judgment as a matter of law for defendants on Count VIII of plaintiff's complaint.

## VI. Motion 4: Punitive and Exemplary Damages under Counts XVII and XVIII and Hedonic Damages

■ In their fourth motion, defendants seek summary judgment on plaintiff's claim for punitive, exemplary, and hedonic damages. Since both parties agree that the exemplary damages relate solely to the exhumation claims, the court will reserve judgment on this issue until those claims are decided after the additional discovery is completed. Because the court finds that plaintiff's state law claims are preempted by federal law, plaintiff's claims for punitive and hedonic damages, as they relate to the preempted state law counts, are preempted as well. Should plaintiff somehow contend that she deserves punitive or hedonic damages under the remaining state law count, breach of express warranty (Count V), the court will address defendants' motion at that time.

## VII. Conclusion

Pursuant to defendants' first motion, the court finds that plaintiff's state law claims presented in Counts I–IV, VI, VII, IX, X, XI, XIII, and XV are preempted by section 360k of the MDA. The court reserves judgment on defendants' second motion for summary judgment on Counts XII and XIV relating to the exhumation until additional discovery is completed. Finally, the court finds that plaintiff's Count VIII does not fall under the Magnuson–Moss Warranty Act. Because the court finds that all but one of plaintiff's state law claims are preempted by the provisions of the MDA, the court will not address the remainder of defendants' third and fourth motions for partial summary judgment on Counts IX, X, XVII, XVIII, and on claims regarding hedonic damages. If plaintiff claims that she is entitled to punitive or hedonic damages under the remaining count, breach of express warranty (Count V), the court will decide the issues relating to those damages at that time. The court will decide Count XVII, exemplary damages, when it decides defendants' second motion.

## ORDER

Therefore, it is hereby **ORDERED** that defendants' motion for partial summary judgment on Counts I–IV, VI–XI, XIII, XV, and XVI is **GRANTED.**

It is further **ORDERED** that defendants' motion for partial summary judgment on Counts XVII and XVIII, to the extent that they relate to Counts I–IV, VI–XI, XIII, XV, and XVI, is **GRANTED.**

**SO ORDERED.**