Diane KEMP, Personal Representative of the Estate of Terrance Clay Kemp, Deceased, and Diane Kemp, Individually, Plaintiffs,

v.

PFIZER, INC. and Shiley, Inc., Defendants.

Civ. A. No. 92–71386.

United States District Court, E.D. Michigan, Southern Division.

March 30, 1994.

Mark Granzotto, Detroit, MI, David D. Patton, James A. Reynolds, Jr., David D. Patton Assoc., Bloomfield, MI, for Diane Kemp.

Charles P. Goodell, Jr., Richard M. Barnes, Goodell, DeVries, Leech & Gray, Baltimore, MD, David Klingsberg, Robin A. Tauber, Kaye, Scholer, Fierman Hays & Handler, New York City, Richard C. Sanders, Hill Lewis, Detroit, MI, for Pfizer, Inc.

Richard C. Sanders, Hill Lewis, Detroit, MI, for Shiley, Inc.

*MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MO- TIONS FOR SUMMARY JUDGMENT*

GADOLA, District Judge.

Plaintiff Diane Kemp is seeking damages on behalf of herself and the estate of her husband, Terrance Clay Kemp, from defendants Shiley, Inc. and Pfizer, Inc. based on events arising from the malfunction of an artificial heart valve manufactured by defendants. Before the court are defendants' motions for summary judgment on plaintiff's express warranty claim and on plaintiff's

claims for intentional infliction of emotional distress and fraud relating to the exhumation Mr. Kemp's body. Pursuant to Local Rule 7.1(e)(2) (E.D.Mich. Jan. 1, 1992), the court will dispense with oral argument and decide the motions on the briefs. For the reasons discussed below, the court will grant defendants' motions and dismiss plaintiff's complaint.

## I. Background Facts

On June 22, 1982, Terrance Clay Kemp underwent surgery in Ann Arbor, Michigan for the implantation of a prosthetic heart valve known as the Bjork–Shiley Convexo–Concave Valve (the "C/C valve"). Defendant Shiley is the manufacturer of the valve and is a wholly owned subsidiary of defendant Pfizer. On July 29, 1986, Mr. Kemp died of cardiac arrest, allegedly the result of complications caused by a fracture of the C/C valve. At the time of death, an autopsy was not performed and the possible causes of death were listed as myocardial infarction, valve malfunction, or aortic dissection. Plaintiff Diane Kemp is Mr. Kemp's surviving wife and is the duly appointed representative of his estate. Plaintiff filed a complaint alleging various state law claims including breach of express warranty.

In 1992, the parties engaged in negotiations in an effort to settle plaintiff's claim. During negotiations, defendants refused to admit that the C/C valve was defective and that it fractured. As a result, plaintiff alleges she was forced to exhume her husband's body for an autopsy to determine the cause of death. Mr. Kemp's body was exhumed and an autopsy was performed on August 11, 1992. The autopsy determined that the cause of death was a fracture of the C/C valve. As a result of the exhumation of her husband's body, Mrs. Kemp alleges damages based on intentional infliction of emotional distress and fraud.

## II. Standard of Review

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citation omitted) (quoting Black's Law Dictionary 881 (6th ed. 1979)). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 933, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

■ The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

■ To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly

probative, summary judgment may be granted.

(Citations omitted). *See Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd,* 929 F.2d 701 (6th Cir.1991). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block,* 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### III. Motion 1: Breach of Express Warranty

■ In their first motion for summary judgment, defendants contend that plaintiff's breach of express warranty claim presented in Count V is preempted by federal law. In a previous decision, this court found that plaintiff's state tort, statutory, and implied warranty claims are preempted by 21 U.S.C. § 360k(a) of the Medical Device Amendments of 1976 to the Federal Food, Drug and Cosmetic Act ("MDA"). *Kemp v. Pfizer, Inc.,* 835 F.Supp. 1015, 1020–21 (E.D.Mich. 1993). In the instant motion, defendants argue that plaintiff's express warranty claim is also preempted by the MDA. Section 360k(a) provides as follows:

(a) General rule. Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this Act to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act.

*Id.* Thus, the MDA preempts state laws that impose additional or different requirements on the manufacture of Class III medical devices than those imposed under federal law.

Defendants contend that the express language of the MDA and its regulations preempt plaintiff's express warranty claim. All packaging, labeling, and express warranties relating to the heart valve manufactured by defendants was submitted to the Food and Drug Administration ("FDA") for approval. *See* 21 U.S.C. §§ 321(m), 352(f), & 352(r). As the court noted in *King v. Collagen Corp.,* 983 F.2d 1130 (1st Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993), "the MDA has imposed ... extensive regulation upon class III device manufacturers. The FDA retains rigid control over the entirety of the labeling and packaging of class III products, largely displacing the ability of manufacturers to make additional claims." *Id.* at 1135.

Plaintiff contends that express warranty claims cannot be preempted by section 360k of the MDA, relying on the plurality opinion in *Cipollone v. Liggett Group, Inc.,* — U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). In *Cipollone,* the Court determined that a claim for breach of express warranty was not preempted by the Public Health Cigarette Smoking Act because

[a] manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty. Accordingly, the "requirements" imposed by an express warranty claim are not "imposed under State law," but rather imposed *by the warrantor.* ... In short, a common law remedy for a contractual commitment voluntarily undertaken should not be regarded as a "requirement ... *imposed under State law.*"

*Id.* at — - ——, 112 S.Ct. at 2622, 120 L.Ed.2d at 428–29 (emphasis in original). Thus, plaintiff contends that an action for breach of express warranty on defendants' product is not preempted by the MDA because defendants' warranty was not a requirement established by a state, but rather

a contractual obligation that defendants voluntarily imposed upon themselves.

■ The court finds, however, that plaintiff's claim for breach of express warranty is preempted by section 360k of the MDA. The language in *Cipollone* cited by plaintiff is inapplicable to this case. The federal law at issue in *Cipollone* merely required that cigarette manufacturers include a warning in all advertisements.[1] Manufacturers were not prevented or limited from making any other claims, including express warranties. By contrast, the MDA imposes extensive regulations upon the way in which medical device manufacturers can market and label their products.[2] In similar circumstances, the concurring opinion in *King* found that the MDA preempted an express warranty claim. *King*, 983 F.2d at 1135. The court distinguished *Cipollone* by noting that

> [t]he FDA retains rigid control over the entirety of the labeling and packaging of class III products, largely displacing the ability of manufacturers to make additional claims. This high level of control contrasts with the low level of control in *Cipollone*, and ensures that manufacturers will not be held liable for packaging and labeling imposed by the FDA.

*Id.* In this context, given the extensive control of the FDA, it would not be inaccurate to assert that the warranties and labeling utilized by defendants in this case were imposed upon them by federal regulators. Thus, rather than voluntary obligations, such warranties and labeling are requirements of the FDA. As a result, state law requirements relating to defendants' warranties are preempted by the plain language of section 360k(a).

In a similar situation, the Fourth Circuit held that a claim for breach of express warranty was preempted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, which uses the same preemption language used by the MDA. *Worm v. American Cyanamid Co.*, 5 F.3d 744, 747 (4th Cir.1993). In *Worm*, the court found preemption of an express warranty claim where proposed labeling is subject to extensive review and approval by the Environmental Protection Agency. *Id.* at 747. The court stated that plaintiff's express warranty claim amounted to a claim that "what was approved by the EPA was inadequate." *Id.* at 749. In the same way, an examination of whether defendants breached their warranty of reasonable care in the manufacture of the artificial heart valve at issue would amount to a determination of whether the pre-market approval granted for defendants' device by the FDA was correct. As it has previously stated, this court "will [not] substitute its rather limited judgment in the place of the FDA's expertise, experience, and

---

1. In addition, the court also notes that the language of the preemption statute at issue in *Cipollone* is different from the language used in section 360k. In *Cipollone*, preemption only applied to those requirements "'imposed under State law.'" *Cipollone*, —— U.S. at ——, 112 S.Ct. at 2617, 120 L.Ed.2d at 422. By contrast, preemption under the MDA directs that no state law "may ... establish or continue in effect ... any requirement which is different from, or in addition to, any requirement applicable under this Act ... which relates to the safety or effectiveness" of a class III device. 21 U.S.C. § 360k(a). Furthermore, the regulation governing MDA preemption states that any requirement "which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under the act" is preempted. 21 C.F.R. section 808.1(b). Thus, given the differences in the statutes, the analysis undertaken in *Cipollone* is distinguishable.

   Furthermore, the plurality opinion in *Cipollone* found that the express warranty claims presented by that case were not imposed by state law, but were voluntarily undertaken by the manufacturer. However, the Supreme Court has previously held that liability for promises or warranties under state contract law is a requirement that is imposed by a state. *Cipollone*, —— U.S. at ——, 112 S.Ct. at 2636, 120 L.Ed.2d at 445 (Scalia, J., concurring in the judgment in part and dissenting in part) (quoting *Norfolk & Western R. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) ("A contract has no legal force apart from the law that acknowledges its binding character.")). Since the express warranty requirements established by state law in this case are different from the requirements imposed under the MDA, the court finds that those state requirements are preempted by federal law.

2. *See, e.g.*, 21 U.S.C. § 360e(c)(1)(F) (manufacturer must submit sample labels for FDA approval); 21 U.S.C. § 360e(d)(2)(D) (FDA may deny approval of device if the "proposed labeling is false or misleading in any particular"); 21 C.F.R. § 801 (requirements for contents of labeling).

congressional mandate to ensure that Class III medical devices comply with federal law and regulations." *Kemp*, 835 F.Supp. at 1022.

In conclusion, the court finds that section 360k(a) of the MDA preempts plaintiff's express warranty claim. Allowing plaintiff to proceed with her claim would establish a state law requirement that is additional to and different from the extensive regulations imposed by the MDA that relate to the safety and effectiveness of defendants' class III medical device. Because the court will grant defendants' motion for summary judgment on plaintiff's express warranty claim, the court need not decide any of the subsidiary issues relating to damages raised by defendants.

## IV. Motion 2: Exhumation Claims

### A. Initial Analysis

In their second motion, defendants seek summary judgment on Counts XII and XIV. Plaintiff bases Counts XII and XIV upon the circumstances surrounding the exhumation and autopsy of her husband's body. She claims that defendants knew that her husband's death was caused by the fracture and failure of the C/C valve implanted in his heart, but refused to admit it, thereby forcing her to exhume and perform an autopsy on the body in order to prove that a fracture of the valve was the cause of death. As a result, plaintiff claims that defendants are liable for fraud and intentional infliction of emotional distress. Defendants contend that plaintiff was not forced to conduct the exhumation and that they had no obligation to concede a disputed fact.

The exhumation and autopsy occurred on August 11, 1992. Plaintiff alleges that defendants knew that the failure of the C/C valve caused the death of Mr. Kemp as early as May 27, 1992. On May 27, 1992, defendants informed the FDA, pursuant to FDA reporting requirements, that a valve fracture may have caused Mr. Kemp's death. Based on defendants' letter to the FDA and the opinion of defendants' own expert, plaintiff alleges that defendants made fraudulent representations that she relied upon that the cause of her husband's death was in dispute.

After reviewing the evidence, however, the court finds little support for plaintiff's claims surrounding the exhumation. Defendants' knowledge concerning the cause of Mr. Kemp's death was very limited and was in fact equal to plaintiff's knowledge of the issue. At the time of his death, no autopsy was performed. The following three maladies were listed as possible causes of death: (1) myocardial infarction; (2) valve malfunction; or (3) aortic dissection. Additionally, X–Rays of the body taken at the time of death that might have been helpful were destroyed by the hospital pursuant to normal procedures. Finally, even the physician who performed the valve implantation surgery, Dr. Marvin Kirsch, admitted that "the exact cause of death could only be ascertained if the body were exhumed." Defendants' non-testifying expert also merely concluded that it was "likely" that a valve malfunction was the cause of death.

The report to the FDA that plaintiff heavily relies upon, indicates that the cause of death was in dispute. After receiving notice of plaintiff's lawsuit and her allegations concerning the C/C valve, Shiley reported to the FDA that it had received "information that reasonably suggests" that the valve "may have caused or contributed to a death or serious injury."[3] Thus, defendants were not in possession of some secret information that they were concealing from plaintiff in an effort to force her to exhume her husband's body.

■ Both of plaintiff's claims are also problematical because of the circumstances surrounding the decision to exhume Mr. Kemp's body. The discussions between defense counsel and plaintiff's counsel during the summer of 1992 occurred in the context of settlement negotiations. Evidence of such discussions would not be admissible under Rule 408 of the Federal Rules of Evidence. Rule 408 provides that "[e]vidence of conduct

---

**3.** Shiley was required to make this report under 21 C.F.R. § 803.24. Section 803.24(f) makes clear, however, that this type of report is not an admission that the device caused or contributed to a death or even that it malfunctioned. *Id.*

or statements made in compromise negotiations" is not admissible. Fed.R.Evid. 408. As a result, plaintiff cannot rely upon any statements by defense counsel during the negotiations in order to prove her claims. After this preliminary exploration, the court will now proceed to examine in detail each of the claims relating to the exhumation

### B. Intentional Infliction of Emotional Distress

■ The Michigan Supreme Court has not yet recognized intentional infliction of emotional distress as a tort under the common law. *Roberts v. Auto–Owners Ins. Co.,* 422 Mich. 594, 374 N.W.2d 905, 906 (1985). Michigan appellate courts, however, have clearly established it. Michigan courts have relied upon the definition of the tort laid out in the *Restatement (Second) of Torts* § 46. In order to make out a claim, plaintiff must show that defendants engaged in (1) extreme and outrageous conduct; (2) that intentionally or recklessly; (3) caused; (4) severe emotional distress to the plaintiff. *Dickerson v. Nichols,* 161 Mich.App. 103, 409 N.W.2d 741, 743 (1987). Comment g qualifies the type of conduct that can be considered extreme and outrageous. It reads as follows:

> The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.

*Restatement, supra,* cmt. g. In this case, defendants simply refused to establish an element of plaintiff's case. Defendants required plaintiff to prove her case by obtaining additional proof.

■ As a matter of law, the court finds that defendants' refusal to admit that the C/C valve was defective, that it fractured, and that it caused Mr. Kemp's death was not extreme and outrageous conduct. Based solely on the medical file, no one could conclusively state that the C/C valve was the cause of death. Defendants were privileged in their refusal to admit a disputed fact in the course of litigation. Michigan courts have held that refusals to settle claims do not constitute intentional infliction of emotional distress. *See Roberts,* 374 N.W.2d at 909 n. 7 (" 'mere denial of liability or refusal to pay, even though unreasonable and in bad faith, is not deemed outrageous' "); *Runions v. Auto–Owners Ins. Co.,* 197 Mich.App. 105, 495 N.W.2d 166, 168 (1992) (refusal to pay claim not extreme and outrageous); *Wendt v. Auto–Owners Ins. Co.,* 156 Mich.App. 19, 401 N.W.2d 375, 378 (1986) (even bad faith refusal to settle claim was not extreme and outrageous conduct). Because plaintiff brought the lawsuit, defendants can require her to establish each element of her case. *See also Early Detection Ctr. v. New York Life Ins. Co.,* 157 Mich.App. 618, 403 N.W.2d 830, 834 (1986) ("resorting to a court of law for the resolution of its dispute" was not extreme or outrageous). Similarly, defendants in this case refused to admit fault without further evidence. In the context of this lawsuit, rather than extreme, such conduct is merely ordinary.

### C. Fraud

■ In order to show fraud in Michigan, a plaintiff must prove with clear and convincing evidence that the defendant (1) made a material representation; (2) that was false; (3) that when the defendant made the misrepresentation it knew it was false; (4) that the defendant made the misrepresentation with the intention that it should be acted upon by the plaintiff; (5) that the plaintiff acted in reliance upon it; and (6) that the plaintiff suffered injury. *Gorman v. Soble,* 120 Mich.App. 831, 840, 328 N.W.2d 119 (1982).

■ Plaintiff claims that defendants defrauded Mrs. Kemp when they told her on June 2, 1992, that her claims against them were without merit based on their conclusion that his death may not have been caused by the fracture of her husband's C/C valve.[4]

---

4. Plaintiff also tries to revive her fraud claim by arguing that defendants perpetrated a fraudulent scheme throughout the marketing of the valve to convince people not to perform autopsies in order to avoid exposure of defective valves. Not only is this argument tenuous and convoluted, it

The court finds that plaintiff has failed to establish that defendants made a material misrepresentation of fact. Defendants' *opinion* that Mr. Kemp's death may have been caused by something other than the C/C valve does not amount to fraud. The only evidence available at the time was Mr. Kemp's medical file. Although the files appear to indicate that Mr. Kemp died of a faulty valve, this fact could not be conclusively proven without an autopsy and an examination of the valve itself. Defendants' opinion regarding the cause of death, stated in the context of settlement negotiations, is not sufficient to support plaintiff's claim of fraud. *See 3 P.M., Inc. v. Basic Four Corp.,* 591 F.Supp. 1350, 1367 (E.D.Mich.1984) ("statement of opinion cannot provide the basis for an action for fraud"); *Connellan v. Himelhoch,* 506 F.Supp. 1290, 1296 (E.D.Mich.1981) ("expression of opinion" does not satisfy material representation element). Even though defendants' own medical expert may have concluded that it was "likely" that the valve fractured, defendants could still present their opinion that the cause of death had not been conclusively established. Such conduct is not fraud.

### D. Conclusion

Although it was unfortunate that the exhumation and the autopsy took place, and the court certainly sympathizes with Mrs. Kemp, the fact remains that Mrs. Kemp made her own decision to pursue a lawsuit against the defendants. In order to prove an element of her lawsuit, Mrs. Kemp chose to have an autopsy performed. This choice by Mrs. Kemp, as a matter of law, does not amount to fraud or the intentional infliction of emotional distress by defendants. Because there are no genuine issues of material fact, and because defendants deserve judgment as a matter of law, the court will grant defendants' motion for summary judgment on plaintiff's claims relating to the exhumation.[5]

### *ORDER*

**THEREFORE, IT IS HEREBY ORDERED** that defendants' motion for summary judgment on Counts V, XII, XIV, XVII, and XVIII is **GRANTED.** Plaintiff's complaint is **DISMISSED** on the merits.

**SO ORDERED.**

### *JUDGMENT*

This action came before the Court, Honorable Paul V. Gadola, District Judge, presiding, and the issues having been duly considered and a decision having been duly rendered,

**IT IS ORDERED AND ADJUDGED** that the plaintiffs take nothing on the counts remaining in their complaint and that the entire action be dismissed on the merits.

---

was also not the basis for the fraud count in plaintiff's amended complaint.

5. Because it will grant defendants' motions for summary judgment on plaintiff's remaining

claims, the court will not decide any of the legal issues raised by the parties relating to the availability of punitive, hedonic, and exemplary damages.