**The People of the State of ILLINOIS, ex rel. Raymond MOTA, Chairman of the Capital Development Board, Plaintiff,**

v.

**CENTRAL SPRINKLER CORPORATION and its Subsidiary Central Sprinkler Company, Defendant.**

No. 01–3124.

United States District Court, C.D. Illinois, Springfield Division.

Dec. 3, 2001.

Linda Sue Hayes, Office of Attorney General, Springfield, IL, for Plaintiff.

J. Gordon Cooney, Jr., Emily J. Lawrence, Ashley L. Keene, Morgan, Lewis & Bockius, LLP, Philadelphia, PA, Michael J. Hayes, Gardner, Carton & Douglas, Chicago, IL, Joseph Brooks, Morgan, Lewis & Bockius, LLP, Washington, DC, for Defendant.

## OPINION

RICHARD MILLS, District Judge.

Commercial or industrial water sprinkler systems are not manufactured for use by the average consumer. Thus, the Mag-

nuson–Moss Warranty Act does not apply and that portion of the complaint is dismissed.

But first—the procedural and factual backdrop.

### Procedural History

Plaintiff filed its complaint in state court on March 13, 2001. Defendants received the complaint on March 20, 2001. Defendants removed the action to federal court on April 18, 2001 pursuant to 28 U.S.C. §§ 1441 and 1446. The District Courts of the United States have subject matter jurisdiction over alleged violations of the Magnuson–Moss Warranty Act. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the Plaintiff's state law claims which arise out of the same nucleus of operative facts.

### Background

During a period stretching from the early 1990s through mid–1998, the State of Illinois ("Plaintiff") installed Omega Prohibitor QR sprinklers,[1] manufactured by Central Sprinkler Corporation and Central Sprinkler Company ("Defendants"), in several State of Illinois buildings. These buildings include correctional institutions, mental health facilities and office buildings.

The sprinkler was designed to perform when exposed to certain temperatures. According to Defendants' Product Description, a fusible alloy pellet is compressed with a bearing disc into a copper housing by a ball plunger. Heat is absorbed by the heating fins and conducted to the alloy pellet. At the triggering temperature, the alloy is supposed to melt, causing the ball plunger to drop, freeing balls from the retaining groove. This movement allows system water pressure to force the orifice

---

1. It is unclear which model of the Omega Prohibitor QR the Plaintiff purchased. The two listed in the product description attached to the complaint are the C–1A PRO QR and the HEC–12 PRO QR.

sealing mechanism and deflector assembly open. When the Omega Prohibitor QR is connected to a sprinkler system, water is then discharged in a designed flow pattern. Plaintiff's complaint alleges that the Omega series sprinklers are defective products because they do not function in a significant percentage of instances.

In 1998, the Consumer Product Safety Commission ("CPSC") filed a complaint against Central Sprinkler alleging that the Omega series of sprinklers did not perform in accordance with Underwriters Laboratories, Inc.'s Standard for Safety UL 199 or the National Fire Protection Association Standard 13.

After the CPSC's complaint was filed, the CPSC and Central Sprinkler entered into a consent agreement that initiated a recall of the defective OMEGA sprinklers. Pursuant to the consent agreement Central Sprinkler offered to provide a replacement sprinkler free of charge or a cash alternative of Five dollars per sprinkler actually replaced. In addition, owners who replaced their sprinklers could draw funds from a trust contribution program which would attempt to reimburse some replacement labor costs. Plaintiff alleges that the offered recall program would not come close to financing the replacement of all of its sprinklers. Plaintiff has replaced in excess of 30,000 sprinklers at a cost of over $3 million. Instead of utilizing the recall program, the Plaintiff is suing under a number of theories, including, but not limited to the following: breach of express warranties, breach of implied warranties, misrepresentation, product liability and breach of warranty under Magnuson–Moss Warranty Act. Defendants filed a Motion to Dismiss all twelve counts of Plaintiff's complaint.

In Plaintiff's Response to Defendants' Motion to Dismiss, Plaintiff concedes that Count X, the claim asserted under the Consumer Product Safety Act 15 U.S.C. § 2072, is without merit. Plaintiff alleged that Defendants failed to report to the Consumer Product Safety Commission information it purportedly obtained about alleged failures of Omega sprinklers, as required by CPSA rules codified at 16 C.F.R. §§ 1115 and/or 1116. The Seventh Circuit has held that there is no private right of action for alleged violations of the Act's reporting requirements. *Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 939–44 (7th Cir.1988). Therefore, there is only one federal claim remaining in Plaintiff's complaint: the alleged violation of the Magnuson–Moss Warranty Act.

*Magnuson–Moss Warranty Act*

I. *Purpose*

■ The Magnuson–Moss Warranty Act became effective in 1975. Its purpose was (1) to make warranties on consumer products more readily understood and enforceable and (2) to provide the Federal Trade Commission (FTC) with means of better protecting consumers. H.R.Rep. No. 93–1107, 1974 U.S.C.C.A.N. 7702.[2] It was enacted in response to a problem that had been growing since the advent of the assembly line and the ability to mass produce goods. With these inventions, American consumers began to have access to a growing assortment of goods which brought convenience and pleasure to their lives. *Id.* at 7705. Along with these new conveniences came concern over the quali-

2. This report was written by the Committee on Interstate and Foreign Commerce following an evaluation of House Bill No. 7917. Senate Bill 356, which was substantively simi-

lar to House Bill No. 7917, was passed in lieu of the House bill and became Public law 93–637.

ty and durability of the goods produced. *Id.*

On January 8, 1969, the Task Force on Appliance Warranties and Service consisting of the Chairman of the Federal Trade Commission, the Secretary of Commerce, the Secretary of Labor, and the Special Assistant to the President for Consumer Affairs which had been designated by President Johnson in his Consumer Message to the Congress on February 6, 1968, issued its report. *Id.* at 7709. In preparing the report, the FTC studied over 200 warranties used by 50 manufacturers of major appliances. The report identified a number of problems associated with these warranties:

> The consumer does not have a readily available or practical means of compelling the manufacturers or the retailer from whom he purchased the appliance or the servicing agency responsible for its maintenance to perform their respective warranty obligations. There is substantial evidence that at the time of the sale, the purchaser of a major appliance does not understand the nature and extent of the protection provided by the manufacturer's warranty or of the obligation under the warranty of the manufacturer or the retailer. This lack of understanding may be due to deceptive advertisements, a misleading or inaccurate explanation by the salesman who sold the appliance, or to the content and terminology of the warranty itself.

*Id.* With a goal to cure these deficiencies, the Magnuson–Moss Warranty Act ("Act") was promulgated. It provides:

> In order to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products, any warrantor warranting a consumer product to a consumer by means of a written warranty shall, to the extent required by rules of the Commission, fully and conspicuously disclose in simple and readily understood language the terms and conditions of such warranty.

15 U.S.C. § 2302.

II. *Application*

The Act defines "consumer" as a buyer (other than for purposes of resale) of any consumer product. 15 U.S.C. § 2301(3). "Consumer product" is "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed.)" 15 U.S.C. § 2301(1). The Federal Trade Commission's Rules explain:

> This means that a product is a 'consumer product' if the use of that type of product is not uncommon. The percentage of sales or the use to which a product is put by an individual buyer is not determinative. For example, products such as automobiles and typewriters which are used for both personal and commercial purposes come within the definition of consumer product. Where it is unclear whether a particular product is covered under the definition of consumer product, any ambiguity will be resolved in favor of coverage.

16 C.F.R. § 700.1(a).

Plaintiff asks the Court to decide that fire sprinklers, specifically designed for use in institutional occupancies, such as correctional facilities and mental health facilities, fall within the Act's definition of consumer products. Although this specific issue has not been addressed in any reported decision, several courts have decided that certain commercial goods do not meet the definition of "consumer product."

In *Crume v. Ford,* 60 Or.App. 224, 653 P.2d 564 (1982), the plaintiffs were cattle ranchers who bought a flatbed truck from defendant, Francis Ford, Inc. *Id.* at 565. After purchasing the flatbed truck, plaintiffs noticed a howling noise coming from the rear end. *Id.* Repeated attempts to fix the defect were unsuccessful. Plaintiffs sought relief under the Magnuson–Moss Act. The trial court directed a verdict for defendant Ford on the ground that there was no evidence that the truck was a "consumer product" as defined by the Act. *Id.* at 567. The Oregon Court of Appeals affirmed the decision stating that there was insufficient evidence presented that a flatbed truck met the definition of consumer product. *Id.*

In *Frank v. Allstate Auto Sales,* No. 60530, 1992 WL 90728 (Ohio Ct.App. 8th Dist.1992), plaintiff alleged that he entered into an agreement to purchase a 1980 Ford tow truck from defendant, but that defendant later refused to complete the agreement and sold the truck to another customer. Plaintiff asserted a cause of action under the Magnuson–Moss Act. The trial court entered judgment for the defendant following a bench trial. The appellate court affirmed the trial court's decision stating, "Plaintiff did not produce any evidence that tow trucks such as in the case *sub judice* are normally used for personal, family or household purposes. Plaintiff's testimony revealed that he desired to purchase the tow truck exclusively for use in his new business named 'Jim's Towing Service.' As a result, plaintiff's claim under the Magnuson Moss Act was properly denied." *Id.* at *4.

In *In re Ford Motor Company Vehicle Paint Litigation,* No. MDL 1063, 1996 WL 426548, at *1 (E.D.La. July 30, 1996) Ford vehicle owners filed a class action lawsuit alleging that their vehicles were painted with a two step enamel/electrocoat paint

process that caused the paint on their vehicles to peel. *Id.* at *1. Defendant paint companies moved to dismiss plaintiffs' Magnuson–Moss claim because the electrocoat paint was not a consumer product. Plaintiffs alleged in the complaint that Ford purchased the high build electrocoat paint marketed by the paint companies for commercial application at Ford manufacturing facilities. *Id.* at *35. The complaint alleged that the product was sold to a commercial buyer for commercial purposes. The district court held, "as such, it is not a 'consumer product' and cannot form the basis for a claim under the Act." *Id.*

In *Essex Insurance Co. v. Blount, Inc.,* 72 F.Supp.2d 722 (E.D.Tex.1999) the insurer of a piece of heavy timber equipment brought action against the equipment's manufacturer to recover damages when the insured equipment malfunctioned. The court stated that the heavy timber equipment was not normally used for personal, family or house-hold purposes. "In fact, it is designed almost exclusively for commercial use. Consequently, it does not fit the federal statute's definition of a consumer product and thus plaintiff cannot assert a claim under § 2301." *Id.* at 723.

 In this case, Defendants' "Product Description" of the Omega Prohibitor QR Institutional Pendent & Sidewall Automatic Sprinklers is important. The beginning paragraphs state,

The Omega Prohibitor QR series of automatic sprinklers have been specifically designed for use in institutional occupancies, such as correctional facilities and mental health facilities, where the occupants may attempt to employ the fire sprinklers for the purpose of self-inflicted injury.

Both pendent and horizontal sidewall styles of Prohibitor QR sprinklers are recessed into the mounting surface with

only a small portion of the heat collecting fin assembly projecting into protected space. The fin assembly has an average break-away load of 68 lbs., and a maximum break-away load of 85 lbs. Unlike other institutional sprinklers, the escutcheon plate and optional closure plates are firmly attached to the recessed sprinkler body with tamper resistant retaining screws.

Defendants advertise this sprinkler model as an institutional sprinkler, not a sprinkler that would be used in a home for personal, family or household purposes. Like the piece of heavy timber equipment in *Essex,* the electrocoat paint in *Vehicle Paint Litigation,* the tow truck in *Frank,* and the flatbed truck in *Crume,* these sprinklers were designed almost exclusively for commercial use. Commercial sprinklers are normally used in commercial buildings. *See* 16 C.F.R. 700.1(a). Because their normal use is commercial, these sprinklers are not consumer products.

## III. *Statutory Construction*

Plaintiff asserts that the sprinklers should be considered personal property. The Court interprets Plaintiff's statement as an argument that sprinklers are, in Magnuson–Moss Act terminology, "separate items of equipment attached to real property." 16 C.F.R. 700.1(c). It asserts that these sprinklers were installed after the state buildings were erected, are separate items of equipment, and covered by the Act.

FTC Rules separate products into two major categories: products which are separate items of equipment attached to real property and products that are not (otherwise known as "integral component parts of the structure"). *See* 16 C.F.R. §§ 700.1(c)-(f). Separate items of equipment, such as air conditioners, furnaces, and water heaters, are always covered by the Act. *See id.* at § 700.1(c).

## A. Separate Items of Equipment

■ The Court finds that fire sprinklers are not separate items of equipment. Sprinklers are integral component parts of the plumbing system and of the structure that they protect.

The Court believes the FTC would agree with this assessment. On November 26, 1976, the FTC issued an advisory opinion. Advisory Opinion, 88 F.T.C. 1030 (November 26, 1976). The opinion was issued in response to a question posed by Home Owners Warranty Corporation. Two lists followed the Advisory Opinion. The first list contained items that would be covered by the Act when sold as part of an existing home. The second list contained items that would not be covered by the Act when sold as part of an existing home. The opinion indicated that the key to the difference was "the distinction between the physical separateness of an item and the separate function of an item." 88 F.T.C. 1030, page 2. The opinion also states that:

roofing shingles and furnaces may be physically separate items at a given point in time. However, physical separateness of an item is not determinative. Rather it is the separateness of function which distinguishes the two. A furnace has a 'mechanical, thermal or electrical function' apart from the realty, whereas roofing shingles have no function apart from the realty.

*Id.* The FTC listed "sprinkler heads" in the second list, finding that sprinkler heads were not separate items of equipment, had no function apart from the realty and therefore, would not be covered by the Act when sold as part of an existing structure. *See id.* at Appendix A.

**B. Non-separate Items of Equipment (Integral Component Parts)**

Whether non-separate items of equipment (integral component parts of the structure, such as wiring, plumbing, ducts, and other items) are consumer products depends upon how they are purchased. *See* 16 C.F.R. §§ 700.1(d),(e). The FTC Rules describe five basic purchase situations: (1) when a consumer purchases any products "which go into the construction of a consumer dwelling" when sold "over the counter" by hardware and building supply retailers; (2) when a consumer contracts to purchase materials in the improvement, repair, or modification of a home (for example, paneling, dropped ceilings, siding, roofing, storm windows, remodeling); (3) when a consumer purchases a dwelling where the products cannot be practically distinguished from the realty; (4) when a consumer contracts to build a home; or (5) when a consumer contracts for a substantial addition to be added to the home (such as a garage or an in-ground swimming pool). *Id.* at §§ 700.1(e),(f).

■ Plaintiff asserts that the sprinklers were purchased and installed in already existing buildings. That would place these purchases into situations one or two. The first purchase situation, outlined in Section 700.1(e), indicates that goods purchased over the counter from hardware and building supply retailers will be considered consumer products even if they are not separate items of equipment.

■ The complaint states that Plaintiff purchased these sprinklers from vendors. Plaintiff does not allege that these sprinklers could be purchased by consumers at retail hardware or home improvement

stores. In addition, Exhibit 5, attached to Plaintiff's complaint, asserts that these sprinklers were sold exclusively by Defendants' distribution outlets.[3] Therefore, the sprinklers at issue do not meet the Act's definition of consumer products. *Id.* "Goods that are not customarily available to the ordinary person are not consumer products." *Kemp v. Pfizer, Inc.*, 835 F.Supp. 1015, 1024 (E.D.Mich.1993)(holding that heart valves were not consumer products because they were not sold to unsuspecting consumers relying on the warranties of unscrupulous retailers); *In re Minnesota Breast Implant Litigation*, 36 F.Supp.2d 863, 876 (D.Minn.1998).

In addition, § 700.1(e) only covers products bought to be placed in consumer dwellings. Correctional facilities, mental institutions, and office buildings are not consumer dwellings. These sprinklers do not qualify as consumer products under the first purchase situation.

The second situation Plaintiff's purchase might fit into is also unavailable. The FTC Rules indicate that when "a consumer contracts for the purchase of such materials in connection with the improvement, repair, or modification of a *home*" these materials will be considered consumer products. § 700.1(e) (emphasis added). The key word in that statement is home. These sprinklers were not purchased to improve, repair or modify a home. They were institutional sprinklers installed in commercial buildings, mental institutions, and correctional facilities. The sprinklers do not qualify under the second purchase situation either. *See id.*

These sprinklers do not meet the definition of consumer products because they cannot be bought by consumers "over the counter" and are not built into consumer

---

**3.** Although it cannot be considered on a Rule 12(b)(6) Motion to Dismiss, the Court notes that an affidavit submitted by Carmine Schiavone, the Defendants' vice-president of General Services, avers that these sprinklers could not be purchased by consumers at a retail hardware or home improvement store.

dwellings or homes, but rather into commercial or industrial buildings. *See* 16 C.F.R. § 700.1(c),(e).

### C. Interpretation of "Consumer Product" under the CPSA

Plaintiff next asserts that in deciding whether sprinklers fall within the Act's definition of "consumer product," the Court should look to the Consumer Product Safety Commission's interpretation of the Consumer Product Safety Act ("CPSA"). In 1998, the CPSC filed a complaint against Defendants asserting that certain Omega sprinklers were defective. The complaint listed several Omega models and labeled them as "consumer products." Plaintiff argues that because the sprinklers met the CPSA's definition of a consumer product, they should also meet the Magnuson–Moss Act's definition of consumer product.

■ The CPSC's decision is not dispositive. The definition of consumer product under the CPSA has been interpreted as being much broader than the definition of consumer product under the Magnuson–Moss Act.[4] *See State Fair v. U.S. Consumer Prod. Safety Comm'n,* 650 F.2d 1324, 1332 (5th Cir.), *cert. granted, vacated as moot,* 454 U.S. 1026, 102 S.Ct. 560, 561, 70 L.Ed.2d 470 (1981) (definition of "consumer goods" under the Magnuson–Moss Act is much narrower than definition of "consumer goods" under the CPSA); *CAT Aircraft Leasing, Inc. v. Cessna Aircraft Company,* No. 87–1022–C, 1990 WL 171010, *4 (D.Kan. Oct.3, 1990); *Kemp,* at 1024 (E.D.Mich.1993). In determining that the sprinklers do not meet the definition of consumer products under the Mag-

nuson–Moss Act, this Court asserts no opinion as to whether the sprinklers meet the definition of consumer product under the CPSA.

■ In addition, the complaint filed by the CPSC identified 20 Omega sprinkler models as defective. It did not identify the specific sprinklers at issue here, the Omega Prohibitor QR (models C–1A PRO QR and HEC–12 PRO QR). Therefore, it is uncertain whether even the CPSC would determine that the C–1A PRO QR and HEC 12 PRO QR models would meet the definition of consumer product under the CPSA.

### IV. *Policy*

Finally, this Court does not believe that the purpose of the Magnuson–Moss Warranty Act would be served if institutional sprinklers purchased by the State of Illinois were covered by the Act. The Act's stated purpose is to protect the average consumer. The State of Illinois, purchasing 30,000 institutional sprinklers, is not by anyone's estimations, an average consumer. To decide that the State of Illinois needs protection from a corporation selling sprinklers is ludicrous.

Because the Act seeks to achieve its purpose by protecting those who purchase consumer products, this approach will often protect commercial buyers, like the State of Illinois. However, the only way a commercial buyer may seek relief under the Magnuson–Moss Warranty Act is to purchase a consumer product. The State of Illinois has not done that here.

### Conclusion

This Court finds that the Omega Prohibitor QR C–1A PRO QR and HEC–12 PRO

---

**4.** The CPSA defines "Consumer product" as "any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise." 15 U.S.C. § 2052(a)(1) (2001).

QR do not meet the Magnuson–Moss Warranty Act's definition of consumer products. The Court will ALLOW Defendants' Motion to Dismiss as to Count IX.

Because the Seventh Circuit has held that there is no private right of action for alleged violations of the Act's reporting requirements, the Court will ALLOW Defendants' Motion to Dismiss Count X. *See Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 939–44 (7th Cir.1988).

■ The only remaining claims arise from state law. According to the supplemental jurisdiction statute, a district court "may decline to exercise supplemental jurisdiction" over pendent state law claims if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); *see Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1250 (7th Cir.1994). The Seventh Circuit has stated that "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright*, 29 F.3d at 1251; *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 727–728, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). "At that point, respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns." *Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir.1989).

*Ergo*, this Court will ALLOW Defendants' Motion to Dismiss as to Counts IX and X. Because this case was originally removed from state court, it is remanded there for resolution of the remaining state law claims.